Mrs. Copeland

Feb 18, 1958

# MEMORANDUM

Re: Historical survey re gifts from
foreign monarchs and governments
to Government officers.

Article I, § 9, clause 8, of the Constitution pro-
vides as follows:

"No Title of Nobility shall be granted by
the United States: And no Person holding any
Office of Profit or Trust under them, shall,
without the Consent of Congress, accept of any
present, Emolument, Office, or Title, of any
kind whatever, from any King, Prince, or Foreign
State." 1 U.S.C., p. XLI.

At the constitutional convention Charles Pinckney of South
Carolina on August 23, 1787, urged the necessity of pre-
serving foreign ministers and other officers of the United
States independent of external influences. Thereupon this
provision of the Constitution was adopted without discus-
sion. 1/

The absence of any such discussion may, perhaps, be
attributable to a generally comparable provision in the
Articles of Confederation which were signed on July 9, 1777.
It provided in pertinent part as follows:

"Article VI. No State without the consent of
the United States in Congress assembled, shall send
any embassy to, or receive any embassy from, or
enter into any conference, agreement, alliance or
treaty with any king, prince or state; nor shall
any person holding any office of profit or trust
under the United States, or any of them, accept of

##FN1

1/ 3 James Madison, Papers 1403 (1840).

any present, emolument, office or title of any kind whatever from any king, prince or foreign state; nor shall the United States in Congress assembled, or any of them, grant any title of nobility. * * *" 1 U.S.C., p. XXX. /2/

The Articles of Confederation were finally ratified on March 1, 1781.

They were thus in effect when Benjamin Franklin returned home after serving for many years as the American minister plenipotentiary to France. Upon his departure King Louis XVI of France sent Franklin a gift. Franklin wrote to John Jay, Secretary for Foreign Affairs for the Continental Congress:

"I received from the King, at my departure, the present of his picture set round with diamonds, usually given to ministers plenipotentiary, who have signed treaties with that court, and it is at the disposition of Congress, to whom be pleased to present my dutiful respects." /3/

/2/ This Article was so reported to the Continental Congress as Article IV of the proposed Articles of Confederation by the committee of the whole on August 20, 1776. 5 Journals of the Continental Congress 675 (Government Printing Office, 1906). It represents a slight revision of the proposed Articles of Confederation which were submitted on July 12, 1776, by a special drafting committee under the chairmanship of John Dickinson. Ibid. 547.

/3/ 10 Benjamin Franklin, Works 223 (1840). "(But the gifts of kings are seldom quite free gifts. Franklin, as was expected of him, gave the official in charge of the present a gold snuffbox worth a tenth as much as the miniature, and fifty louis d'or to his assistant.)" Van Doren, Benjamin Franklin 722 (1938). By his will Franklin bequeathed the gift to him to his daughter. Ibid. 761. For an account of the circumstances preceding the consent of the Continental Congress in 1780 to the acceptance of a similar medallion by Arthur Lee of Virginia, see 1 Brant, James Madison 62-64 (1940).

At the Virginia debates on the ratification of the Constitution on June 15, 1788, Governor Randolph said with respect to this constitutional prohibition:

"This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they are restrained by regulations of the community. An accident (sic) which actually happened operated in producing the restriction. A box was presented to our ambassador by the king of our allies. It was thought proper in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states. I believe that if, at that moment, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war." /4/

Apparently he was referring to the farewell gift of Louis XVI to Franklin. A Virginia historian later wrote:

"Dr. Franklin is the person alluded to by Randolph. In the winter of 1856, in Philadelphia, under the roof of a venerable granddaughter of Dr. Franklin I saw the beautiful portrait of Louis XVI, snuff-box size, presented by that king to the doctor. As the portrait is exactly such as is contained in the snuff-box presented by Crowned heads, one of which I have seen, it is probable this portrait of Louis was originally attached to the box in question, which had with the lapse of years been lost or given away by Dr. Franklin." /5/

/4/ 3 Elliott, State Debates on the Adoption of the Constitution 465-466 (1854). An examination of the index to The Federalist does not indicate that there was a discussion in The Federalist of the constitutional prohibition respecting gifts from foreign governments.

/5/ From H. B. Grigsby, History of the Virginia Federal Convention of 1788, contained in 9 Virginia Historical Society Collections (New Series) 264.

- 3 -

This statement may explain whatever uncertainty there may be as to whether the gift to Franklin was a medallion or a portrait affixed to the top of a snuff box. In view, however, of the restriction in the Articles of Confederation on the acceptance by officers of the American Revolutionary Government of gifts from foreign governments, there would seem to be some question as to whether the generally comparable restriction in the Constitution is due solely to the gift of the King of France to Franklin.

On January 6, 1834, President Jackson sent a special message to Congress stating that it appears that the United States consul at Tangier--

"has been induced to receive from the Emperor of Morocco a present of a lion and two horses, which he holds as belonging to the United States. There being no funds at the disposal of the Executive applicable to the objects stated by Mr. Leib [the consul], I submit the whole subject to the consideration of Congress for such direction as in their wisdom may seem proper." 3 Richardson, Messages and Papers of the Presidents 37 (1896).

The House Committee on Foreign Affairs proceeded to investigate the matter. In asking to be discharged from further consideration of the matter, it made the following report:

"The President adds that he had directed instructions to be given to our ministers and agents abroad requiring them to abstain in future, unless the consent of Congress shall have been previously obtained, from the acceptance of presents, under any circumstances, from foreign States; and founding himself (sic) on the supposed effect of these instructions, to prevent the acceptance of presents hereafter, he invites the attention of Congress to those which have been heretofore made to public officers, and deposited by the orders of the Government in the Department of State. He represents these as useless, and their custody as attended with inconvenience, on which account, and on the ground that the constitutional provision in relation to their acceptance may be regarded as satisfied by the surrender

- 4 -

of the articles to the Government, he recommends the disposal of them to the original donors, or the representatives of such as are deceased.

10. "The Government of the United States is the only one known to lay its agents employed in foreign intercourse under strict interdiction as regards the acceptance of presents in any form. This interdiction being in the constitution, could derive no increase of notoriety, more than authority from instructions to our agents abroad. Instructions have probably been given, however, at the earliest period ascertained of the Government, and were certainly given in the year 1817, as will appear from a document appended to this report.

10. "The acceptance of presents has, notwithstanding, taken place, on several occasions, and under circumstances, which the committee are not prepared to say should not exempt this conduct from censure. In all others than the Christian States of Europe, (and in these to a greater or less extent,) the interchange of presents between the authorities and foreign agents is not only matter of invariable usage, but an established form of respect; the breach of which, by refusal of acceptance on the part of the foreign agent, would furnish an occasion of resentment, compromising oftentimes the efficacy of the agency, or it might be even the official immunities or personal security of the agent. The last instances of the acceptance of presents by our agents abroad, have been explained by considerations of this nature. In the case of the horses received by the commissioner of the United States from the Ottoman Porte, &c., this officer alleged the fear that the important commercial interests we were seeking at that time to adjust and confirm, would probably have been suspended by his adherence to the constitutional restriction. Mr. Jefferson, when President, did not refuse a similar present, made directly to himself, and could only have been influenced by similar inducements. In the present instance, the consul alleges that 'the present could not be declined without the greatest insult to an Eastern sovereign.'

Acceptance has never, in any case, in which it has occurred, been the result of want of knowledge or recollection of the constitutional prohibition. As regards the disposal of the presents in the cases alluded to, as of former occurrence; in the first, Mr. Jefferson, without any reference to Congress, ordered the horses to be sold, and the money put into the Treasury. In the second, that of the horses presented by the Ottoman Porte, this committee expressed an opinion in asking to be discharged from the consideration of the message of the President on the subject, that the precedent in Mr. Jefferson's Presidency furnished a sufficient guide to the Executive. In conformity to this opinion, the horses were sold under order of the Executive in this last case also, and the money applied in discharge of the expenses which had been incurred in their transportation to the United States, and maintenance. As the horses in the present case are represented as fine, the proceeds of their sale may be expected to produce a fund adequate, at least, to meet expenses. The committee are of opinion, therefore, that the same course should be pursued in this, as the former instances to which allusion has been had, and report accordingly.

"As regards the recommendation of the President, that the presents deposited in the State Department should be delivered to the original donees, or the representatives of the decedents, the committee, on consideration of the subject, are not disposed to take the same view. They find, on recurring to a list and estimate of the probable prices of these presents, that only a few of them would be of pecuniary value to the receivers, if the President's recommendation were complied with, and they apprehend that the barriers set up by the constitutional inhibition, as regards the acceptance of presents, might possibly be weakened by this course of procedure. The foreign agents of the Government might be led to look with more facility on the considerations which may excuse a departure from the strict line of restraint imposed by the Constitutional obligation. As regards a considerable proportion of the articles in question too, it appears that the names of the donors and depositors have not been preserved; so that the recommendation could not be carried into

- 6 -

effect, or the inconvenience from the custody of the articles, which seems to have been a principal inducement to it, obviated or relieved."

* * *

"Extract from instructions of J. Q. Adams, Secretary of State of the United States, to R. Rush, Envoy Extraordinary and Minister Plenipotentiary of the United States at London, dated

Washington, November 6, 1817.

"A custom prevails among the European Sovereigns, upon the conclusion of treaties, of bestowing presents of jewelry, or other articles of pecuniary value, upon the minister of the Power with which they were negotiated; the same usage is repeated upon the minister's taking leave at the termination of his mission. In Great Britain it is usual to offer the minister, at his option, a sum of money, graduated according to his rank, or a gold box or other trinket of equal value. The acceptance of such presents by ministers of the United States is expressly prohibited by the constitution; and even if it were not, while the United States have not adopted the custom of making such presents to the diplomatic agents of foreign Powers, it can scarcely be consistent with the delicacy and reciprocity of intercourse between them, for the ministers of the United States to receive such favors from foreign Princes, as the ministers of those Princes never can receive from this Government in return. The usage, exceptionable in itself, can be tolerated only by its reciprocity. It is expected by the President, that every offer of such present which may, in future, be made to any public minister or other officer of this Government, abroad, will be respectfully, but decisively, declined."

"(Circular)

Department of State,

Washington, January 6, 1834.

"Sir: I am directed by the President to instruct the ministers, consuls, and other diplomatic and

- 7 -

commercial agents of the United States, that it is required of them that, in future, they will not, unless the consent of Congress shall have been previously obtained, accept, under any circumstances, presents of any kind whatever, from any King, Prince, or foreign State.

"You will therefore govern yourself accordingly". H. R. Rep. No. 302, 23rd Cong., 1st Sess. 1-4 (1834). 6/

Attorney General Cushing expressed the opinion that the constitutional provisions forbade a United States Marshal in Florida from acting as Commercial Agent of France. 6 Op. Atty. Gen. 409 (1854). See also 13 id. 537 (1871).

Apart from any other instructions which may have been issued from time to time by the President or the Secretary of State, and any restrictions which may have been contained in any early appropriation acts, the first statutory restriction on the acceptance of gifts from foreign governments appears in the Act of August 18, 1856. It was an Act to regulate the diplomatic and consular systems of the United States which became effective by its own terms on January 1, 1857.

Section 19 provides in pertinent part as follows:

"Nor shall any diplomatic or consular officer * * * ask or accept for himself or any other person, any present, emolument, pecuniary favor, office, or title of any kind from any such [foreign] government". 11 Stat. 59.

In the Congressional Globe there is no report of any debate on this Act. This provision was retained when § 19 of this Act was amended in other respects by the Act of June 17, 1874, 18 Stat. 77. See also Rev. Stat. § 1751 (1878 ed.).

Section 1 of the Act of January 31, 1881, gives the consent of Congress to the acceptance by nine named persons

---

6/ With respect to the reference to the horses presented by the Ottoman Porte, see H. R. Rep. No. 107, 21st Cong., 2d. Sess. (1831).

of specified decorations and presents which had been tendered to them by foreign governments. Section 3 provides as follows:

"Any present, decoration, or other thing which shall be conferred or presented by any foreign government to any officer of the United States, civil, naval, or military, shall be tendered through the Department of State, and not to the individual in person, but such present, decoration, or other thing shall not be delivered by the Department of State unless so authorized by act of Congress." 21 Stat. 604, 5 U.S.C. § 115. /7/

Thereafter Acting Attorney General Hoyt expressed the opinion that it would not be sound to hold that a titular prince, even if not a reigning potentate, is not included in the constitutional prohibition, and that the words "or other thing" in the 1881 Act, supra, would preclude the acceptance by an American military or civil officer of a photograph of Prince Henry of Prussia, a brother of the Emperor of Germany and King of Prussia. The Attorney General observes that the constitutional provision "has been viewed as particularly directed against every kind of influence by foreign governments upon officers of the United States, based on our historic policies as a nation." 24 Op. A. G. 116, 117 (1902). Attorney General Wickersham construed the constitutional prohibition as extending to a clerk of the fourth

/7/ See also United States Consular Regulations § 421 (1888), Ibid. § 451 (1896 with amendments to 1919). And see § 1002 of the Foreign Service Act of 1946 which provides in pertinent part as follows:

"An officer of the [Foreign] Service [of the United States] shall not ask or, without the consent of the Congress, receive, for himself or any other person, any present, emolument, pecuniary favor, office or title from any foreign government. * * *" 60 Stat. 1030, 22 U.S.C. § 804.

class in the Post Office Department, stating that he was an inferior officer of the United States, 27 id. 219 (1909)./8/

The Act of June 27, 1934, gave the consent of Congress to the acceptance of certain decorations and gifts by certain named retired officers of the Executive Branch and by a named member of the Legislative Branch. It also provides that the Secretary of State shall submit to each alternate Congress a list of those retired officers or employees of the United States for whom the Department of State, under the provisions of 1881 Act (5 U.S.C. § 115), is holding decorations, orders, medals, or presents tendered them by foreign governments, 48 Stat. 1267, 5 U.S.C. § 115a.

By Executive Order No. 7577 dated March 19, 1937, it is provided that "Americans and diplomatic and consular officers are hereby prohibited from accepting in any circumstances any present, decoration, or medal, order, testimonial, or other thing that may be tendered to them by any foreign king, prince, or foreign state," 2 Fed. Reg. 572. A similar prohibition is incorporated in § I-23 of the amendments to the foreign service regulations which were made in Executive Order No. 8396, dated April 18, 1940, 3 CFR 134 (1940 Supp.). Finally, by Executive Order No. 9321 dated February 13, 1945, the previous limitations

/##FN8

/8/ But see the holding that the constitutional prohibition is not applicable to a part-time employee of the Geological Survey who does not take an oath of office, 28 id. 508 (1911). Other diplomatic precedents, both earlier and later, are collected in 4 Hackworth, Digest of International Law 475-485 (1942). The Acting Secretary of State advised the American Embassy in Chile that the prohibition against the acceptance of foreign decorations does not apply to wives of officers of the United States, ibid. 481.

on the authority of the Secretary of State to prescribe regulations relating to the duties of officers and employees of the Foreign Service and the transaction of their business were revoked, and he was authorized to substitute therefor his regulations, 3 CFR 355 (1943-1948 Compilation). 2/

The currently applicable regulations of the Secretary of State with respect to such matters are as follows:

10 030 **Definitions**

* * *

10 "**Employee**: Either an officer or an employee." 4 Foreign Service Manual 030 (p. 1)

10 "625 **Acceptance of Gifts, Titles and Emoluments**

10 "625.1 **Gifts From Foreign Governments**

10 "No American employee shall accept any decoration, gift or emolument of any kind from any foreign sovereign, foreign government, or from any state, province, or municipality, or from any governmental or semi-governmental agency, or from any international organization of states, notwithstanding the fact that the United

2/ This Executive Order provided for the revocation inter alia of Executive Order No. 8396, supra, as of the date of issuance of the orders or regulations of the Secretary of State that cover the subject matter. He is directed to designate in his order or regulation the parts of an Executive Order which is intended to be superseded by such order, and to publish such order or regulation in the Federal Register. Ibid. 356. No research has been made as to whether any such notice has been published in the Federal Register with respect to § 1-23 of the foreign service regulations in Executive Order No. 8396, supra.

States is a participant in such international organization. Moreover, to assure absolute equality and uniformity in this regard, no American employee shall ever wear any foreign decoration while serving in such capacity.

*625.3 - Refusal of Gifts From Foreign Government

"When it is necessary for an employee to refuse, or on his own behalf or on behalf of some other person, any decoration, gift or emolument offered by a foreign government, the refusal shall be made in as gracious terms as possible, attention being invited to the fact that acceptance is prohibited under the laws of the United States. Employees shall take such precautionary measures as seems advisable to avoid being placed in a position where it becomes necessary to refuse such decoration, gift or emolument from a foreign government." 4 Foreign Service Manual 625.

From time to time Congress has granted a general consent for the acceptance within a specified period of time by American citizens and personnel of the Armed Forces of medals or decorations tendered to them by foreign governments in connection with armed conflicts in which the United States was a participant. For such consent with respect to World War I, see the Act of July 9, 1918, 40 Stat. 845, 872, 10 U.S.C. §§ 1422 and 1423; and with respect to World War II, see the Act of July 20, 1942, which also gave consent to the acceptance of decorations, orders, medals, and emblems from the governments of the other American Republics, 56 Stat. 662, 10 U.S.C. § 1423(a). /10/ In addition there are permanent exceptions for reserve officers and officers of the National Guard not on active duty. See the Act of July 1, 1930, 46 Stat. 841, and the Act of June 15, 1933, 48 Stat. 155, as amended, 50 U.S.C. § 901.

##FN10

/10/ It is understood that General Vaughan, a member of President Truman's staff, accepted an award from President Peron of Argentina under this provision on the ground that World War II had not then been terminated.

- 12 -

Requests for the consent of Congress for the acceptance of medals, gifts and awards tendered to certain officers of the United States by foreign governments were considered by the Senate Committee on Foreign Relations in 1910. The report was submitted on behalf of the Committee by Senator Elihu Root, a former Secretary of War and Secretary of State.

Referring to the pendency of 200 such requests, the report made the following observations:

"It seems that requests of this character should be passed upon in accordance with some declared principle of action, so that one officer should not have his request refused and another receive authority as the result of accidental circumstances attending the presentation of the request.

"The existence of the prohibition in the Constitution indicates that the presumption is against the acceptance of the present, emolument, office, or title. A habit of general and indiscriminate consent by Congress upon such applications would tend practically to nullify the constitutional provision, which is based upon an apprehension, not without foundation, that our officers may be affected in the performance of their duties by the desire to receive such recognition from other governments. A strong support for the view that the practice should not be allowed to become general is to be found in the fact that the Government of the United States does not confer decorations or titles or, unless in very exceptional cases, make presents to the officers of other governments. It is not suitable that we should permit our officers to receive courtesies which we do not reciprocate by extending similar courtesies to the officers of other governments. We are of the opinion that the following rules should be observed:

"1. That no decoration should be received unless possibly when it is conferred for some exceptional, extraordinary, and highly meritorious act, justifying beyond dispute a special mark of distinction.

- 13 -

"2. That no presents should be received except such articles as are appropriate for souvenirs and marks of courtesy and appreciation and having an intrinsic value not disproportionate to such a purpose.

"3. That the acceptance of presents within the limitation above stated should be further limited to cases in which some exceptional service or special relation justifying the mark of courtesy exists between the recipient and the government offering the present.

"4. That no offer of any other title or emolument or office should be considered.

"5. We consider that membership in learned societies, even though the appointment thereto may have a quasi governmental origin, should not be considered as coming within the constitutional provision, and it may well be that as to certain trifling gifts, such as photographs, the rule of de minimis lex non curat should be deemed to apply." S. Rep. No. 373, 61st Cong., 2d Sess. (1910). [11]

The bill in question was passed by the Senate, but died in the House. The standards or criteria in the report submitted by Senator Root may, however, be of interest to the Senate Committee on Government Operations. On November 27, 1957, Assistant Attorney General White informed the Committee Chairman that there had been no change by this Department in its interpretation of the 1902 Opinion, supra.

There have been issued the President's Memoranda of January 6, 1950, and April 13, 1954, to the Heads of Executive Departments and Establishments, respecting the procedure for the periodic submission by the Secretary of State to Congress of an omnibus bill respecting the consent of Congress to the acceptance of medals and other gifts to Government officers and employees which have been tendered by foreign governments. These Memoranda are not published in the Federal Register.

[11] Reproduced in 45 Cong. Rec. 3182-3186 (1910).

- 14 -